## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAMES PAUL.GRACEY.94 AND MIKE.LANG.127648 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 21-mj-118-01-02-AJ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Matthew J. DiCarlo being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook usernames that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the usernames.

2.      I am a Special Agent with the Social Security Administration – Office of the Inspector General and have been since February 2020.  I am currently assigned to the Manchester, New Hampshire Field Office.  My duties include conducting investigations regarding all crimes against the Social Security Administration ("SSA") and its benefit

programs; as well as crimes involving stolen identities and Social Security Numbers ("SSNs").  I

am conducting numerous investigations involving benefits fraud and I am familiar in the ways

that these schemes are facilitated and advanced.  I am a graduate of the Criminal Investigator

Training Program, taught at the Federal Law Enforcement Training Center in Brunswick,

Georgia.  Prior to becoming a Special Agent with SSA, I was a United States Probation officer

for the U.S. District Court, District of New Hampshire.  I served the Federal Judiciary from April

2007 until February 2020.  I am a graduate of the Probation and Pretrial Services Officer

Training Academy, taught at the Federal Law Enforcement Training Center in Charleston, South

Carolina.  I received a Bachelor of Arts degree in Sociology from Keene State College in 2006.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud) have been

committed by PAUL GRACEY.  There is also probable cause to search the information

described in Attachment A for evidence of these crimes or fruits of these crimes, as described in

Attachment B.

## PROBABLE CAUSE

5.      The Social Security Administration (SSA) was alerted via an anonymous caller,

later determined to be                   that Paul GRACEY was collecting Supplemental Security

Income (SSI) benefits while residing full-time in Mexico.  It is illegal to receive SSI benefits

while residing outside the United States.  The anonymous caller reported that GRACEY reached

out asking for her help conducting a wire transfer of his Social Security payments to an account he could access in Mexico.

6.      On November 30, 2020, I queried the SSA database for GRACEYs Social Security Number (SSN) and confirmed that it was assigned to PAUL GRACEY.  GRACEY filed for SSI on February 13, 2014, and was granted benefits.  GRACEY currently receives $794 a month via direct deposit to his American Express National Bank account.  GRACEY provided SSA with a residential address of                                                    Phoenix, AZ and a mailing address of                                        Manchester, NH in care of

7.      On December 1, 2020, I queried online databases to verify GRACEY's personal address.  The query did not reveal any notable information.  On the same date, I queried online databases to discover available information on                               and confirmed that            did live at                                        Manchester, NH.

8.      On January 12, 2021, Special Agent (SA) Michael Gibson and I conducted an unannounced visit to                                        Manchester, NH.  A female answered the door and identified herself as                                        told us that she was the person who provided the anonymous information concerning GRACEY to SSA.  GRACEY was a friend of her deceased husband.  GRACEY contacted her via Facebook Messenger and asked if she would be willing to conduct a wire transfer for him.  GRACEY asked her to go to Walmart and to wire his monthly SSI benefits from an account in the United States to GRACEY in Mexico. stated that she felt uncomfortable with GRACEY's request, and turned it down. showed me the conversation that she had with GRACEY via Facebook Messenger; however, GRACEY had deleted his remarks from the application.  Only the remarks made by were observable.            has known GRACEY to be living in Mexico for approximately four

3

(4) years.                 said that GRACEY uses multiple Facebook accounts (Booie Gracey, Paul Gracey, Paulie Gracey) as his main source of communication.

9.       I conducted a public page search for Paul GRACEY on Facebook.com, and determined that GRACEY's username is "paul.gracey.94".  I was unable to locate a Facebook account for "Booie Gracey" or "Paulie Gracey"

10.       On January 26, 2021, I obtained a U.S. border crossing summary from U.S. Customs and Border Protection.  The information detailed GRACEY's entries into the United States.  Of note, GRACEY's last re-entry to the United States occurred on or about September 14, 2018.  Representatives from U.S. Customs and Border Protection and Homeland Security Investigations reported to me that "exit data" from the U.S. to Mexico is not available.

11.       On February 17, 2021, I queried the SSA database for GRACEY's SSN              and found that GRACEY had recently provided SSA with the updated mailing address of              , C/O Jason Rock, Phoenix, AZ 85053.

12.       On March 23, 2021, I submitted a collateral request to the SSA/OIG office in Phoenix, AZ, seeking their assistance in investigating the recent address provided by GRACEY.

13.       On April 7, 2021, Special Agent (SA) Eric Olson conducted an online database search and determined that the mailing address provided by GRACEY was not valid.  SA Olson determined that Jason Rock actually lived at                                    , Glendale, AZ 85053.  That same day, SA Olson went to Rock's address and met with "Ashley" who described herself as the stepdaughter of Rock.  "Ashley" stated that she did not know GRACEY.  SA Olson provided his contact information and asked "Ashley" to have Rock call him when he returns home.

4

14.     Later on April 7, 2021, SA Olson received a call from Rock.  Rock said that he has never met GRACEY in person and that GRACEY is the boyfriend of his sister, Paulette Rock.  Rock communicates with his sister through Facebook Messenger, and last spoke to her on the previous day.  Rock said GRACEY and his sister have lived together near Acapulco, Mexico for approximately four (4) years, but he was uncertain if GRACEY has been living in Mexico the entire time.  Rock stated that GRACEY asked to use his mailing address so that the SSA could send GRACEY a "yearly thing."

15.     On April 19, 2021, GRACEY called SSA Claims Representative (CR) Judy Salameh to provide a new mailing address of                          Burlington, VT 05408, in care of a Jeff Stratton and a personal phone number of                          GRACEY told the CR that he was living homeless in Arizona and only wanted to use the address in Vermont for mail, and he had no intentions of living there.  During the call the CR advised GRACEY that statements made to SSA must be truthful, under penalty of perjury.  When asked, GRACEY told the CR that he had never resided outside of the United States.  GRACEY said that he did travel to Mexico about 2 or 3 years ago, but could not remember the exact details and he was confused.  When GRACEY was asked about specific details of his living situation, he told the CR to cancel his change of address request and he immediately hung up the phone.

16.     On April 20, 2021, I queried SSA databases for Paulette Rock, the reported paramour of GRACEY.  Paulette Rock currently receives Social Security Disability Insurance (SSDI) and has an address on file with SSA of                          Glendale, AZ 85308.  Based on SA Olson's interview on April 7, 2021, it was known that Paulette Rock does not live at that address.

17.      On May 10, 2021, I conducted a follow up, telephonic, interview with

                        reported that since we last spoke, on January 12, 2021, GRACEY had

contacted her again via Facebook Messenger using the username "mike.lang.127648."  In those

messages, GRACEY asked her to add his name (Paul GRACEY) to her mailbox, and he asked

her to forge his signature on a document that the SSA would be mailing to her address.

Clements reportedly refused GRACEY's requests.  Clements also clarified comments that she

made to me during the previous interview concerning GRACEY's request to conduct a wire

transfer on his behalf.  GRACEY asked Clements (via Facebook Messenger) to accept a money

transfer from GRACEY at a U.S.-based Walmart location and then use Western Union to wire

that same money to GRACEY in Mexico.

18.      Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the

general public.

19.      Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter.  This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

address (including city, state, and zip code), telephone numbers, screen names, websites, and

other personal identifiers.  Facebook also assigns a user identification number to each account.

20.      Facebook users may join one or more groups or networks to connect and interact

with other users who are members of the same group or network.  Facebook assigns a group

identification number to each group.  A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

21.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

22.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

23.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

24.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

25.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

26.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

27.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

28.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

29.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

30.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

31.     Facebook also retains Internet Protocol ("IP") logs for a given username or IP address.  These logs may contain information about the actions taken by the username or IP address on Facebook, including information about the type of action, the date and time of the action, and the username and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

32.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like

9

Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

33.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account

10

activity may provide relevant insight into the Facebook account owner's state of mind as it

relates to the offense under investigation.  For example, information on the Facebook account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort

to conceal evidence from law enforcement).

34.     Therefore, the computers of Facebook are likely to contain all the material

described above, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction

information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

35.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

36.     Based on the foregoing, I request that the Court issue the proposed search

warrant.

37.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving it on Facebook.  Because the warrant will be served on Facebook, who will then

11

compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

38.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

39.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **REQUEST FOR SEALING**

40.      I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Matthew J. DiCarlo

Matthew J. DiCarlo
Special Agent
Social Security Administration –
Office of the Inspector General

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:  May 12, 2021

Andrea K. Johnstone

Time:  10:09 AM, May 12, 2021      U.S. Magistrate Judge



12

## <u>ATTACHMENT A</u>

**Property to Be Searched**

This warrant applies to information associated with the Facebook usernames

**PAUL.GRACEY.94** and **MIKE.LANG.127648** that is stored at premises owned, maintained,

controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

I.   **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each username listed in Attachment A:

(a)   All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **January 1, 2016 to present.**

(c)   All photos and videos uploaded by that username and all photos and videos uploaded by any user that have that user tagged in them **January 1, 2016 to present**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that username, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user January 1, 2016 to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account **January 1, 2016 to present**;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(p)     All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person

regarding the user or the user's Facebook account, including contacts with support

services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

14 days of issuance of this warrant.

**II.** **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 641 involving PAUL GRACEY since on or about January 1, 2016, including, for each username identified on Attachment A, information pertaining to the following matters:

(a) Evidence indicating communications between PAUL GRACEY and other Facebook users, including "gurldrivesford" (Kelli Clements), wherein GRACEY requests wire transfers be made on his behalf;

(b) Evidence indicating specific times that GRACEY's Facebook account was accessed in the country of Mexico;

(c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

(e) The identity of the person(s) who created or used the username, including records that help reveal the whereabouts of such person(s).

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Facebook, and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

5

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature